UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

BOURNE HUDDLESTON,

Petitioner,

v.

COREY FHUERE,

Respondent.

Case No. 6:23-cv-00531-AB

OPINION AND ORDER

Julie Pitt Vandiver
Office of the Federal Public Defender
District of Oregon
101 SW Main Street
Suite 1700
Portland, OR 97204

Attorney for Petitioner

Nick M Kallstrom
Oregon Department of Justice
1162 Court Street, NE
Salem, OR 97301-4096

Attorney for Respondent

## INTRODUCTION

Petitioner brings this habeas corpus case pursuant to 28 U.S.C. § 2254 challenging his state-court convictions for Murder, Attempted Aggravated Murder, and Unlawful Possession of a Firearms Silencer. For the reasons that follow, the Amended Petition (ECF No. 24) is denied.

## BACKGROUND

### I. Trial Court Proceedings

In November 2011, Petitioner unsuccessfully solicited Michael Yorrie and Joe Nuckolls to kill his wife, Kristy Huddleston. On March 23, 2012, Petitioner shot and killed Kristy in their family home, while their 10-year-old son, E, was sleeping.

On March 30, 2012, a Jackson County grand jury indicted Petitioner for Murder (Count 1), Attempted Aggravated Murder (Counts 2 and 6), Solicitation to Commit Aggravated Murder (Counts 3 and 7), Attempted Murder (Counts 4 and 8), Solicitation to Commit Murder (Counts 5 and 9), and Unlawful Possession of a Firearms Silencer (Count 10). Resp't Ex. 102 (ECF No. 21-1). Attorney Robert Abel was appointed to represent Petitioner.

Petitioner proceeded to a jury trial in May 2014. The Oregon Court of Appeals summarized the evidence presented at Petitioner's trial:

> [Petitioner] was married to the victim, and they had a son, E. [Petitioner] was having an affair with [Lori] Roberts, of which the victim was aware. [Petitioner] was enrolled as a full-time student at Rogue Community College and was in the paramedics program. He was taking an EMT class with his friend, Yorrie. In early November 2011, [Petitioner] and Yorrie were on a 15-minute break from their EMT class, when [Petitioner] told Yorrie that he "could not stand [the victim] and just wanted her gone." He offered Yorrie $20,000 to kill her. [Petitioner] outlined a detailed plan to have Yorrie kill the victim in the morning as she was headed to work. [Petitioner] wanted the shooting to appear as an "armed robbery gone bad." He planned to pay Yorrie from the proceeds of the victim's life insurance policy. Yorrie declined [Petitioner]'s offer, but arranged for [Petitioner] to meet his cousin at a McDonald's in White City.

> Around Thanksgiving 2011, [Petitioner] met with Yorrie's cousin, Nuckolls, and [Petitioner] offered to pay Nuckolls $20,000 to kill the victim. [Petitioner] articulated a plan to have Nuckolls lie in wait in a field near the victim's home with a sniper rifle and shoot her as she was leaving her home. [Petitioner] discussed an alternative plan to have Nuckolls shoot the victim at point-blank range as she was going up the stairs into her home. Nuckolls told [Petitioner] that he would consider the offer. Eventually, Yorrie and Nuckolls met [Petitioner] in a parking lot behind a Superior Athletic Gym, where Nuckolls declined [Petitioner]'s offer. [Petitioner] responded, "Either way I'm going to get it done. I'll find somebody else. It doesn't matter." Neither Nuckolls nor Yorrie took any steps toward killing the victim. Instead, [Petitioner] offered to pay Yorrie $5,000 in exchange for an alibi, if [Petitioner] ended up committing the murder.
>
> On the night of March 22, 2012, [Petitioner] was assisting Yorrie with a project for one of his classes at Roberts's house. [Petitioner] left Roberts's home to run some errands and asked Roberts and Yorrie not to call or text him while he was out. At around 3:00 a.m. on the morning of March 23, 2012, E, who was 10 years old at the time, was awakened by a scream. E saw [Petitioner], his father, leave his parents' bedroom, walk out to his truck with a gun, and drive away. E entered his parents' bedroom and found the victim lying on her bed covered in blood. He called 9–1–1 and followed the operator's instructions on how to perform CPR. The victim died shortly after the paramedics arrived.
>
> Meanwhile, Roberts finished the class project with Yorrie and drove him home. About an hour later, at 2:40 a.m., [Petitioner] called Yorrie. [Petitioner] told Yorrie, "Hey I'm going to make front line * * * newspaper. You earned your five grand." Yorrie initially provided an alibi to detectives, claiming that [Petitioner] never left Roberts's house, but eventually retracted it.
>
> Investigators traced [Petitioner]'s phone to Roberts's home and arrested [Petitioner]. There, in the bushes, they found parts of the pistol used to shoot the victim and latex gloves in [Petitioner]'s truck. Detectives brought [Petitioner] to the Jackson County Sheriff's office for questioning. [Petitioner] told detectives that, on the night the victim died, he had had an argument with the victim in their bedroom regarding his extramarital affair with Roberts. He claimed that, after he left and shut the door, he heard a gunshot from within the bedroom. At trial, [Petitioner] claimed that the victim committed suicide. A medical examiner, who performed an autopsy on the victim, concluded that she was shot at a distant range, and he classified the manner of her death as a homicide.

*State v. Huddleston*, 278 Or. App. 803, 804-06, *rev. den.*, 360 Or. 604 (2016); Resp't Ex. 112.[1]

---

[1] While Petitioner was awaiting trial, he solicited another inmate to kill Nuckolls. Resp't Ex. 188 at 1. Petitioner ultimately elected to plead guilty to one count of Attempted Aggravated Murder. *Id.* at 2. He challenged that conviction in a separate federal habeas proceeding, and the Oregon

Petitioner was convicted on all counts. Tr. 1212.[2] At sentencing, the trial court merged several of those convictions, ultimately concluding that only Petitioner's convictions for Murder (Count 1), two counts of Attempted Aggravated Murder (Counts 2 and 6), and Unlawful Possession of a Firearms Silencer (Count 10) should not merge. Resp't Ex. 108 at 11. Petitioner was sentenced to life imprisonment with the possibility for parole after 300 months of incarceration on the Murder conviction. *Id.* On the two convictions for Attempted Aggravated Murder, Petitioner was sentenced to 120-month sentences, to be served consecutive to each other and to the 300 months imposed on the Murder conviction. *Id.* at 11-12.

## II. Appellate and Post-Conviction Relief Proceedings

Petitioner filed a direct appeal. He argued that, under Oregon law, his convictions for Attempted Aggravated Murder should have merged with his conviction for Murder. Resp't Ex. 109. The Oregon Court of Appeals affirmed Petitioner's convictions, explaining that "the trial court did not err in deciding that [Petitioner]'s convictions for attempted aggravated murder do not merge with his conviction for intentional murder, because [Petitioner] formulated and executed different plans when he attempted to hire someone else to murder the victim as opposed to when, months later, he killed her himself." *Huddleston*, 278 Or. App. at 811. The Oregon Supreme Court denied review. Resp't Ex. 114.

Petitioner next filed for post-conviction relief ("PCR"). With the assistance of appointed counsel, he proceeded on a Third Amended Petition. Resp't Ex. 157. Relevant to these proceedings, Petitioner raised the following claims of ineffective assistance of counsel:

---

District Court denied relief. Resp't Exs. 191, 192; *Huddleston v. Cain*, Case No. 2:18-cv-00774-JR. That conviction is not at issue in this proceeding.

[2] Citations to the Trial Transcript refers to the original transcript pagination number at the right corner of Respondent's Exhibit Number 104 (ECF No. 21-1).

**A.** Trial counsel failed to move to sever Petitioner's charges that arose from separate acts or transactions, i.e., separate and distinct criminal episodes.

**G.** Trial counsel failed to adequately and effectively crossexamine Joseph Nuckolls and Michael Yorrie.

**H.** Trial counsel failed to object, move to strike, and move for a mistrial in regard to prosecutor Hoppe's improper comments on Petitioner's credibility.

**L.** Trial counsel failed to adequately investigate the nature of the alleged "silencer" from Count 10.

**N.** Trial counsel failed to move against Count 10, demur against the indictment, move to sever the charge, or otherwise object to introduction of an alleged "silencer" – unrelated to the alleged murder – during Petitioner's jury trial.

*See id*. at 5, 9, 13. Petitioner's criminal trial counsel, Mr. Abel, died after the postconviction case had been filed. *See* Resp't Ex. 181 at 2.

The PCR court denied relief in a written decision finding, generally, that "the evidence of Petitioner's guilt is strong and compelling," and, "[o]verall, Trial Counsel provided competent representation at all stages of the proceeding." Resp't Ex. 181 at 2. Petitioner appealed, and the Court of Appeals affirmed without opinion. Resp't Exs. 182, 184. Petitioner belatedly sought review. Pet'r Exs. A, B (ECF No. 35-1). The Oregon Supreme Court excused Petitioner's failure to timely seek review, and denied review. Pet'r Ex. C.

**III. Habeas Petition**

Petitioner filed a *pro se* habeas corpus petition in this Court raising three grounds for relief, with fourteen subclaims of ineffective assistance of counsel contained within Ground One. *See* Pet. at 5-15 (ECF No. 2). Appointed counsel filed an Amended Petition arguing that Petitioner is entitled to relief on four of his subclaims of ineffective assistance of counsel claim contained in Ground One:

**A.** Trial counsel failed to move to sever charges that arose from separate acts or transactions, (i.e., distinct criminal episodes).

**G**. Trial counsel failed to adequately and effectively cross-examine prosecution witnesses Joseph Nuckolls and Michael Yorrie.

**H**. Trial counsel failed to object, move to strike, and move for a mistrial regarding the prosecutor's improper comments, during cross examination and during final summation, on petitioner's credibility.

**J**. Counsel failed to adequately investigate the nature of the alleged "silencer" from Count 10. Counsel further acted unreasonably and ineffectively in failing to object to the introduction of the silencer at trial.

*See* Am. Pet. at 3-4, 6-7, 8 (ECF No. 24).

## DISCUSSION

### I. Conceded Claims

Petitioner concedes that subclaims B, C, D, E, F, and I of Ground One, as well as Grounds Two and Three of his Petition are inexcusably procedurally defaulted. *See* Am. Pet. at 4-6, 8-9; Br. in Supp. at 15-29 (ECF No. 34), Reply at 2 (ECF No. 52). He affirms that he is not pursuing relief on those claims. Reply at 2. Accordingly, habeas relief is denied as to subclaims B, C, D, E, F, and I of Ground One, and also Grounds Two and Three because they are procedurally defaulted and because Petitioner has failed to sustain his burden of demonstrating entitlement to habeas relief on those claims. *See* 28 U.S.C. § 2248 (instructing that "[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true"); *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002).

/ / /

## II. The Merits

### *A. Legal Standards*

#### i. Deference to State Court Decisions

An application for a writ of habeas corpus shall not be granted unless adjudication of the claim in state court resulted in a decision that was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court's findings of fact are presumed correct, and Petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

A state court decision is "contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal habeas court may grant relief "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous. *Id*. at 410. When applying these standards, the federal court should review the "last reasoned decision" by a state court that addressed the issue. *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

ii. Ineffective Assistance of Counsel

The Sixth Amendment provides defendants with the right to assistance of counsel in all criminal prosecutions, which implies the right to effective assistance of counsel. *Missouri v. Frye*, 566 U.S. 134, 138 (2012). To establish a claim of ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984), a habeas petitioner must satisfy a two-pronged test. First, the petitioner must show that counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 686. Such a showing requires the petitioner to overcome a strong presumption that the challenged conduct falls within the "wide range of reasonable professional assistance; that is the [petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689. The first prong thus is satisfied only if "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id*. at 687.

Second, a petitioner must demonstrate prejudice: "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id*. Therefore, it is not enough if counsel's errors had only "some conceivable effect on the outcome of the proceeding." *Id*. at 693. Counsel's errors must have been "so serious as to deprive [the petitioner] of a fair trial, a trial whose result is reliable." *Id*. In making the prejudice determination, the court must "consider the totality of the evidence before the judge or jury." *Id*. at 695.

When considering ineffective assistance of counsel claims under 28 U.S.C. § 2254(d), "it is the [petitioner's] burden to show that the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam).

Moreover, where a state court has adjudicated an ineffective assistance of counsel claim on the merits, a habeas court's review of a claim under the *Strickland* standard, explained above, is "doubly" deferential. *Harrington*, 562 U.S. at 105-06; *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009).

*B. Subclaim A of Ground One*

In subclaim A, Petitioner argues that trial counsel was ineffective for failing to move to sever charges that arose from separate acts or transactions. Am. Pet. at 3-4; Br. in Supp. at 22-25.

i. Relevant Factual Background and State Court Proceedings

Petitioner was initially indicted for Murder (Count 1), crimes related to soliciting Yorrie to kill Kristy on or about November 1, 2011 (Counts 2-5), and unlawful possession a firearms silencer (Count 6). Resp't Ex. 102 at 8-9. Count 1 included language that the murder "constitutes a separate and distinct criminal episode from the conduct described in Counts 2 through 6 of this indictment." *Id*. at 9.

In an amended indictment, Petitioner was charged with crimes relating to soliciting Nuckolls on or about November 8, 2011 (now Counts 6-9). Resp't Ex. 102 at 1-3. The amended indictment also included the Murder charge (Count 1), the crimes relating to soliciting Yorrie to kill Kristy on or about November 1, 2011 (Counts 2-5), and the unlawful possession of a firearms silencer charge (now Count 10). *Id*. The amended indictment did not include the "separate and distinct criminal episode" language from Count 1 of the original indictment. *Id*. at 2.

The joinder statute provides in relevant part:

> (1)((b) Two or more offenses may be charged in the same charging instrument in a separate count for each offense if the offenses charged are alleged to have been committed by the same person or persons and are:
>
> (A) Of the same or similar character;

> (B) Based on the same act or transaction; or
>
> (C) Based on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

Or. Rev. Stat. § 132.560 (2025).

In his PCR proceedings, Petitioner argued that trial counsel was ineffective because he:

> did not move to sever any of the three distinct sets of charges on the grounds that (1) each set of charges arose from separate acts and transactions, i.e., separate and distinct criminal episodes, and (2) joining the three sets of charges was impermissibly and unconstitutionally prejudicial to petitioner.

Resp't Ex. 158 at 11. Petitioner argued that the amended indictment charged him with two crimes with incident dates of March 23, 2012 (Counts 1 and 10), and eight crimes with incident dates in November 2011 (Counts 2-8). *Id*. at 12. Thus, Petitioner maintained that trial counsel should have moved to sever Count 1 from Counts 2-10, and argued "that the indictment was legally defective because it did not expressly allege a legal basis for joining the charges or facts sufficient to support the joinder." *Id*.

In support, Petitioner cited to and relied on *State v. Poston*, 277 Or. App. 137, 144-45, 370 P.3d 904 (2016), *aff'd on recons*, 285 Or. App. 750, 9399 (2017), a case decided nearly two years after Petitioner's criminal trial. *See* Resp't Ex. 158 at 11-13. In *Poston*, the defendant demurred to his indictment on the ground that it failed to comply with Or. Rev. Stat. § 132.560. The defendant argued that "ORS 132.560 required the state to allege in the indictment the basis for joinder – either in the language of the joinder statute or by alleging facts sufficient to sustain the joinder under the statute." *Poston*, 277 Or. App. at 141. The Court of Appeals agreed, holding that, under Or. Rev. Stat. § 132. 560, the prosecution is "required to allege in the charging instrument the basis for joinder in the language of the joinder statute or by alleging facts sufficient to establish compliance with the joinder statute." *Id*. at 144-45. No such basis was alleged in Petitioner's

amended indictment and thus, he argued to the PCR court, that it was fatally flawed under Or. Rev. Stat. § 132.560. Resp't Ex. 158 at 13.

The PCR court denied relief, finding that trial counsel provided constitutional performance since:

i. The charges against Petitioner were properly joined. ORS 132.560(A) or (C).

ii. A Motion to Sever would not have been successful.

iii. Had the charges been severed the result would have been three trials.

iv. Petitioner is not able to show that the outcome of three separate trials would have been any different.

Resp't Ex. 181 at 2.

ii. Analysis

Notably, this Court is bound by the PCR court's determinations of Oregon state law:

> It is not the province of a federal habeas court to reexamine state-court determinations of state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.

*Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus."). The PCR court found that the charges were properly joined under Or. Rev. Stat. § 132.560(A) or (C), which allows joinder where the acts are of the "same or similar character" or are "parts of a common scheme or plan." Resp't Ex. 181 at 2; *see* Or. Rev. Stat. § 132.560(A), (C). The PCR court further found that a motion to sever would not have been successful. Resp't Ex. 181 at 2. In the collateral posture that the instant Petition comes to federal court, the PCR court's determinations of state law are beyond question and must be taken as given. It follows, then, that trial counsel's performance did not fall below an objective standard of reasonableness.

Even assuming that trial counsel performed deficiently by failing to file a motion to sever, the PCR court reasonably determined that Petitioner did not establish prejudice. Petitioner has not established that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687-88, 694; *Styers v. Schriro*, 547 F.3d 1026, 1030 n. 5 (9th Cir. 2008) ("a petitioner claiming ineffective assistance of counsel for failure to file a particular motion must not only demonstrate a likelihood of prevailing on the motion, but also a reasonable probability that the granting of the motion would have resulted in a more favorable outcome in the entire case."). Thus, the PCR court's decision is entitled to deference and habeas relief is denied as to subclaim A of Ground One.

*C. Subclaim H of Ground One*

In subclaim H, Petitioner argues that trial counsel was ineffective for failing to object, move to strike, and move for a mistrial when the prosecutor made improper comments regarding Petitioner's credibility during cross examination and closing argument.[3] Am. Pet. at 7. In his Brief in Support, Petitioner argues only that "[t]rial counsel's failure to object to a serious instance of prosecutorial misconduct in *closing argument* deprived [Petitioner] of a fair trial and prejudiced the outcome. Br. in Supp. at 25 (emphasis added).

<u>i. Relevant Factual Background and State Court Proceedings</u>

Detective Eric Fox interviewed Petitioner shortly after his arrest, and a video recording of that interview was played at trial. Tr. 749-841. Petitioner initially told Detective Fox that he

[3] Petitioner raised a similar claim in his PCR petition. Resp't Ex. 157 at 9-10. On PCR appeal, Petitioner argued only that trial counsel was ineffective for not objecting to the prosecutor's improper comments during his *closing argument*. *See* Resp't Ex. 182 at 29-34 (emphasis added). Thus, any claim that trial counsel was ineffective for not objecting during the prosecutor's *cross examination* was not fairly presented to Oregon's appellate courts and Petitioner would be procedurally barred from doing so now. As such, relief as to that portion of subclaim H is denied because it is procedurally defaulted.

stopped by home around 1:00 a.m. on March 23, 2012, to pick up two laptops. Tr. 765-66. While he was at home, E woke up and came out of his room, asking Petitioner "what the noise was." Tr. 768. Petitioner suggested to Detective Fox that E was woken up by their dogs barking. Tr. 771. Petitioner told E to go back to bed, grabbed the laptops, put the dogs in the kennel and left within about five or ten minutes. Tr. 768-72. He said that he never saw Kristy and that he did not notice anything unusual at or about the house while he was there. Tr. 768-69.

Detective Fox then informed Petitioner that his son, E, had already spoken to police, and told them that that he "woke up, hearing a loud noise, a bang sound," that Petitioner told him "You need to go back to bed," and that he saw Petitioner "carrying around like an M4 rifle outside." Tr. 783. E told police that he saw Petitioner leave, that he found his mom hurt, and that he immediately called 9-1-1. Tr. 783. Petitioner then said, "I need a glass of water and I'm ready to talk." Tr. 783.

At trial, Petitioner admitted that he had initially lied to Detective Fox:

> [Trial counsel]: . . . And as you will recall from what you heard yesterday and what you read, when you started out, you didn't tell the truth.
>
> [Petitioner]: That is correct. I was scared and –
>
> [Trial counsel]: And then at a later point you—as a matter of fact, I think you said, "I'd like a glass of water now. Get ready, I'm ready to talk."
>
> [Petitioner]: Yes, sir.

Tr. 986. On cross-examination, the prosecutor noted that Petitioner had taken a drink of water before or during his trial testimony, just like Petitioner did during his police interview. *See* Tr. 1001-02. The prosecutor referred to Petitioner's interview with Detective Fox, and his request for water before giving "a whole different story," or "switch[ing] your story." *See* Tr. 1023, 1035.

During closing argument, the prosecutor referred to Petitioner's request for water, calling it a "tell":

> [Petitioner]'s then told that [E] woke up hearing a loud noise, a bang sound. He is told that [E] saw him carrying around an M4 rifle outside. He is told that [E] called 911 immediately after he left. He is told that [E] found his mom had been hurt. And that's when he needs to have the ubiquitous, so whenever he's going to change his testimony or his story, right, got to drink a glass of water because that's his tell. (*inaudible*), you're looking for him to drink a glass of water, right? That's his tell. He needs that glass of water because now he's going to make a better story. Because he's kind of thinking, 'I'm out of luck with that story.' He needs a glass of water and he's, quote, 'ready to (*inaudible*).' And supposedly he's going to use his own language, come clean, but the first words out of his mouth to the detectives are, quote, 'You guys are going to ass wipe me.'

Tr. 1139-40. Trial counsel addressed the prosecutor's comments in his own closing argument, and urged the jury not to draw any adverse inference based upon Petitioner's request for water:

> When [the prosecutor] was talking about [Petitioner's] testimony here and he had asked for a glass of water and that you'll note – remember looking at his tape recorded statement yesterday when he started out he didn't tell them the truth. He told you right here in court he didn't, that he lied. Then he had been talking for quite a while and he then stopped after he realized from talking to Detective Fox that what he was saying was not going to add up, and so he stopped and he asked for a glass of water and then he said okay, if you're ready or whatever it was, and then he told them what had happened. And he told you what happened here today. [The prosecutor] said well, he's – this thing with the water is some kind of a gimmick he uses. I didn't quite – I don't know if you did or not, but I didn't understand it. But for some reason [the prosecutor] seems to think this is evidence of deceit. He had a drink of water, he's lying, something such as that. I don't even know why he ever brought it up. But by golly he had a drink of water in here too after he had been testifying for a considerable period of time, and as you all know he was talking away. You've got to have water frequently. So I don't know where he was coming from there.

Tr. 1193-94.

In his PCR petition, Petitioner argued that trial counsel was ineffective because he "failed to object, move to strike, and move for a mistrial in regard to the prosecutor's improper comments on Petitioner's credibility." Resp't Ex. 157 at 9-10. Petitioner argued that the prosecutor's "statement relied on an unscientific, unreliable and biased interpretation of petitioner's statements and testimony, conveying to the jury that [the prosecutor's] impression supported the charges against the petitioner." Resp't Ex. 158 at 19.

The state argued that not all reasonable attorneys would have determined that the prosecutor's comments were improper. *See* Resp't Ex. 161 at 27-28 (citing *State v. Smith*, 4 Or App 261, 264 (1970) ("prosecutorial misconduct" defined as "any activity by the prosecutor which tends to divert the jury from making its determination of guilt or innocence by weighing the legally admitted evidence in the manner prescribed by law"); *State v. Bolt*, 108 Or App 746, 749 (1991) (trial court has "broad discretion in its control of the arguments of counsel"); *Darden v. Wainwright*, 477 US 168, 181 (1986) ("relevant question" is "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" (quoting *Donnelly v. DeChristoforo*, 416 US 637, 644 (1974))). The state also argued that Petitioner failed to "demonstrate resulting prejudice in light of the jury's instructions and the evidence of petitioner's guilt." Resp't Ex. 161 at 32.

The PCR court ultimately rejected the claim, making the following findings of fact and conclusions of law:

> v. Petitioner has failed to show that no reasonable attorney would have failed to object to the State's argument in closing that Petitioner's drinking water during his testimony was a "tell" he was lying. Objection runs the risk of emphasizing the argument to the jury.
>
> vi. Trial Counsel addressed the argument competently in closing.
>
> vii. Petitioner is not able to show an objection would have been sustained.
>
> viii. Petitioner is not able to show that an objection to this argument if sustained would have changed the outcome of the case, particularly in light of all of the other evidence against Petitioner and the jury's ability to observe Petitioner's testimony and weigh his credibility for themselves.
>
> ix. The jury was properly instructed that the arguments of counsel are not evidence and can be assumed to have followed the law.

Resp't Ex. 181 at 3.

ii. Analysis

As noted, this Court must accept as true the PCR court's determination that under state law an objection would not have been sustained. Such state-law conclusions are binding on a federal habeas court. *See Estelle*, 502 U.S. at 67-68 ("[W]e reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Mendez v. Small*, 298 F.3d 1154, 1158 (9th Cir. 2002) ("A state court has the last word on the interpretation of state law.") (citing *McSherry v. Block*, 880 F.2d 1049, 1052 (9th Cir. 1989), *cert. denied*, 499 U.S. 943 (1991)).

Even upon review, the PCR court's determination was not unreasonable. "Because many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct." *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993) (citing *Strickland*, 466 U.S. at 669). Here, the prosecutor's comments are not the type of "egregious misstatement" to which all trial attorneys would be required to object. Reasonable trial counsel could strategically decide to forego an objection and respond to the prosecutor's comments in their own closing argument, as trial counsel did. In this respect, trial counsel's performance fell within the "wide range" of permissible professional legal conduct.

It was also not unreasonable for the PCR court to conclude that, even if an objection had been sustained, Petitioner failed to prove prejudice. Resp't Ex. 181 at 3. The evidence of Petitioner's guilt was substantial, including that Petitioner twice solicited persons to kill Kristy. Petitioner's own account – that Kristy committed suicide – was not supported by any physical evidence. *See* Tr. 643 (medical examiner stating that he "found nothing that would . . . suggest that this was a wound that would be typical of a suicidal wound . . . .").

Additionally, "[a]rguments of counsel generally carry less weight with a jury than do instructions from the court." *Boyde v. California*, 494 U.S. 370, 384 (1990). Any impact the prosecutor's comments might have had on the jury was mitigated by the trial court's instruction prior to closing arguments that "[t]he attorneys' statements and arguments are not evidence." Tr. 1115. The jurors presumably followed the trial judge's instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("[a] jury is presumed to follow its instructions"). Petitioner has not rebutted that presumption here.

For all of these reasons, the PCR court's decision is neither contrary to, nor an unreasonable application of, clearly established federal law and habeas relief is denied as to subclaim H of Ground One.

*D. Subclaim G of Ground One*

In subclaim G, Petitioner argues that trial counsel was ineffective for failing to adequately and effectively cross-examine Nuckolls and Yorrie.[4] Am. Pet. at 6. In his Brief in Support, Petitioner argues only that trial counsel was ineffective for failing to effectively cross-examine Nuckolls. *See* Br. in Supp. at 32-36.

i. Relevant State Court Proceedings

Police first interviewed Nuckolls on March 29, 2012, at his home in front of his finacee, and expressed some reluctance to share details in front of her. Resp't Ex. 173 at 1, 8. Nuckolls said Petitioner offered him $10,000 to kill Kristy. *Id.* at 3-11. Petitioner told Nuckolls that Kristy "goes

[4] Petitioner presented this claim to the PCR court, which denied relief. Resp't Exs. 157 at 9; 181 at 2-3. Petitioner appealed only the PCR court's denial of the claim as it relates to trial counsel's cross-examination of Nuckolls. Resp't Ex. 182 at 27-29. Because Petitioner did not appeal the PCR court's denial of the claim as it relates to trial counsel's cross-examination of Yorrie, he did not fairly present the claim to Oregon's appellate courts. Because he would be procedurally barred from doing so now, that portion of subclaim G is denied as procedurally defaulted.

to work early in the morning," and that the murder could happen in "a field or somethin' right by [Petitioner's] house." *Id*. at 7. Nuckolls said they did not get so far into the details of the murder for Petitioner to suggest a "certain" weapon be used, but Petitioner said he would be present for the murder. *Id*. at 7-8, 11. At a second meeting, Nuckolls gave Petitioner a "final answer," that he would not do it. *Id*. at 15-16. Nuckolls told police that he was "gonna start pullin' my memory here" and agreed to speak with them again if he remembered additional information. *Id.* at 21.

At trial, Nuckolls testified that Petitioner offered him $20,000 to kill Kristy. Tr. 512. According to Nuckolls, Petitioner proposed two different plans for the murder: the first was to shoot Kristy in a field across from his house with "sniper rifle, or a rifle of some sort," and the second was to shoot Kristy "point blank" as she was going up the stairs into her home. Tr. 513. In either scenario, Petitioner wanted to be present, "wanted the shells in his hand again, the gun back in his hand." *Id*. Nuckolls testified that he met Petitioner a second time, at which time he "just told [Petitioner] I wasn't going to do that, I didn't want to do that." Tr. 516.

The PCR court made the following findings of fact and conclusions of law as to this claim:

> ii. With regards to Nuckles [sic], the testimony involves minor inconsistencies rather than an "evolving" story.
>
> iii. Petitioner has failed to provide evidence in this proceeding as to what the testimony of Nuckles [sic] would have been had he been questioned further on cross examination.
>
> iv. Petitioner has failed to show that Trial Counsel's deficiencies in cross examination of either witness would have made a difference in the outcome of the case.

Resp't Ex. 181 at 2-3.

<u>ii. Analysis</u>

In his Brief in Support, Petitioner points to Nuckolls' inconsistent testimony regarding 1) the amount of money Petitioner offered him; 2) whether Petitioner suggested Nuckolls use a

specific weapon for the murder; and 3) whether Petitioner indicated that he planned to be there and collect the shells afterward. Br. in Supp. at 33. Petitioner argues that competent counsel would have developed these inconsistencies before the jury to impeach Nuckolls' claim that Petitioner solicited the murder. *Id*. at 34.

Upon review, the PCR court reasonably concluded that Nuckolls' "testimony involves minor inconsistencies," that would not have impacted the outcome of the trial. Resp't Ex. 181 at 2. "[C]ounsel's tactical decisions at trial, such as refraining from cross-examining a particular witness or from asking a particular line of questions, are given great deference and must . . . meet only objectively reasonable standards." *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000). "When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003); *Catlin v. Broomfield*, 124 F.4th 702, 728 (9th Cir. 2024) ("We owe a great deal of deference to the informed strategies of counsel, including on the scope of cross-examination.").

Here, Nuckolls' testimony that Petitioner offered him any amount of money to murder Kristy – whether $10,000 or $20,000 – constituted a criminal act. Nuckolls' testimony regarding whether Petitioner suggested a certain weapon be used for the murder, whether he would be present for the murder, or whether he wanted to collect the shells afterwards was largely corroborated by Yorrie. Yorrie testified that Petitioner offered him $20,000 for the murder, suggested that the murder could take place in the field across from his home, and wanted the weapon back after the murder. Tr. 401-02, 405. Yorrie testified that Petitioner provided a "similar" deal and details to Nuckolls. Tr. 408-09. Nothing in the record suggests that further questioning Nuckolls on these issues would have elicited exculpatory information.

In sum, the PCR court's conclusion that Petitioner did not demonstrate that trial counsel's performance fell below an objective standard of reasonableness and that the outcome of Petitioner's trial would not have been affected by additional cross examination was not contrary to or an unreasonable application of *Strickland*. Petitioner is therefore not entitled to habeas relief on subclaim G of Ground One.

*E. Subclaim J of Ground One*

In subclaim J, Petitioner argues that trial counsel was ineffective for 1) failing to adequately investigate the nature of the alleged "silencer" from Count 10, and 2) failing to object to the introduction of the silencer at trial. Am. Pet. at 8.[5]

In his Brief in Support, Petitioner argues only that trial counsel performed deficiently because he did not "object to the introduction into evidence of the silencer petitioner allegedly possessed in that it was not involved in the charged and alleged murder." Br. in Supp. at 36-38. He argues that the silencer was inadmissible under Oregon Evidence Code Rule 403, providing that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice," and Rule 404(2), providing that evidence "of a person's character is

---

[5] Petitioner presented similar claims to the PCR court, including:

> L. Trial counsel failed to adequately investigate the nature of the alleged "silencer" from Count 10.
>
> . . .
>
> N. Trial counsel failed to move against Count 10, demur against the indictment, move to sever the charge, or otherwise object to introduction of an alleged "silencer" – unrelated to the alleged murder – during Petitioner's jury trial.

Resp't Ex. 157 at 13, 14. The PCR court denied relief. Resp't Ex. 181 at 3-4. Petitioner did not appeal the PCR court's denial of subclaim L. Thus, he did not fairly present subclaim L to Oregon's appellate courts and he would be procedurally barred from doing so now.

Accordingly, the claim that trial counsel was ineffective for failing to adequately investigate the alleged "silencer" from Count 10, as included in subclaim J of the instant Petition, is denied as procedurally defaulted.

not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion." *Id*. at 36-37. Petitioner contends that the introduction of the silencer "was unfairly prejudicial to the jury's decision-making." *Id*. at 38.

Count 10 of the amended indictment alleged that Petitioner "did unlawfully and knowingly possess a firearms silencer." Resp't Ex. 102. At trial, the State offered the silencer, which had been located by police in Petitioner's garage, as an exhibit. Tr. 486. That exhibit was received without objection. Tr. 488.

In his PCR proceedings, Petitioner alleged that trial counsel was ineffective because he did not "object to [the] introduction of an alleged 'silencer' – unrelated to the alleged murder – during Petitioner's jury trial." Resp't Ex. 157 at 14.[6] He argued that the state failed to show that the silencer was involved in Kristy's murder, and that "[t]he introduction of the home-made alleged silencer and the accompanying Bushmaster rifle M4 were highly prejudicial and had no connection to the underlying murder allegations." *Id*.; *see also* Resp't Ex. 180 at 55-56.

The state argued that the silencer was relevant and not unduly prejudicial. Specifically, the state argued that silencer was admissible "because it was relevant to show petitioner's intent – both in planning the murder of his wife and in soliciting two other people to commit that murder." Resp't Ex. 161 at 44. The state acknowledged that Petitioner did not use the silencer when he murdered Kristy, but argued that the silencer was "not objectionable because it was the basis of a validly joined charge." *Id*.

[6] At his PCR trial, Petitioner testified that the object was a flash suppressor, not a silencer. Resp't Ex. 180 at 14-15.

The PCR court found that "the weapon and attachment were properly admitted in Petitioner's case, and would have been admissible even with [sic] the charge involving the noise suppressor had not been filed or been severed." Resp't Ex. 181 at 4.

Trial counsel's performance did not fall below an objective standard of reasonable where, as here, the PCR court found that the silencer was admissible under Oregon's rules of evidence. This Court must defer to that ruling. *See Woods v. Sinclair*, 764 F3d 1109, 1138-39 (9th Cir. 2014) (noting that a federal habeas court must defer to a state court's ruling if it is based on state law); *see also Mendez v. Small*, 298 F.3d 1154, 1158 (9th Cir. 2002) (acknowledging that "[s]tate courts are the ultimate expositors of state law, and [federal habeas courts are] bound by the state's construction" on state law matters). The silencer was admissible to prove that Petitioner unlawfully possessed it, as alleged in Count 10. As noted, Nuckolls also testified at trial that Petitioner proposed a plan that Nuckolls lie in wait in a field near Petitioner's home with "a sniper rifle, or a rifle of some sort," and shoot Kristy as she was leaving home. Tr. 513. Thus, the silencer was also admissible because it was relevant to show Petitioner's intent to commit the murder even if Count 10 had been severed, as noted by the PCR court.

Because the PCR court's decision does not involve an unreasonable application of clearly established federal law, Petitioner is not entitled to relief as to subclaim J of Ground One, and the Amended Petition is denied in its entirety.

/ / /

**CONCLUSION**

For the reasons identified above, the Amended Petition for Writ of Habeas Corpus (ECF No. 24) is denied. The Court declines to issue a Certificate of Appealability on the basis that Petitioner has not made a substantial showing of the denial of a constitutional right pursuant to 28 U.S.C. § 2253(c)(2).

IT IS SO ORDERED.

08/26/2026
DATE

Amy M. Baggio
United States District Judge